**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

MUSTAFA SULTAN

                              Plaintiff,              Civil No.  20-1747 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                    Defendants.

---

JAY WASYLYNA

                              Plaintiff,              Civil No.  20-1753 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                    Defendants.

---

ROBERT WALLACE

                              Plaintiff,              Civil No.  20-1757 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                    Defendants.

---

---

FOREST TAYLOR

Plaintiff,

Civil No.  20-1758 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

DOUGLAS BRACA

Plaintiff,

Civil No.  20-1763 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

GARY MARTIN

Plaintiff,

Civil No.  20-1765 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

RUSSELL NISBET

Plaintiff,

Civil No.  20-1769 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

VAUGHN SCHER

Plaintiff,

Civil No.  20-1771 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

COREY SHOTT

Plaintiff,

Civil No.  20-1772 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

JORGE ABASCAL et al.

Plaintiffs,

Civil No.  20-1812 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

YONNA ACOSTA et al.

Plaintiffs,

Civil No.  20-1899 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

Defendants.

---

JOHN HARLAN et al.

                  Plaintiffs,         Civil No.  20-1933 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                  Defendants.

---

MIGUEL AGUIRRE et al.

                  Plaintiffs,         Civil No.  20-2039 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                  Defendants.

---

JACQUELINE ARNDT et al.

                  Plaintiffs,         Civil No.  20-2089 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                  Defendants.

---

CURTIS ABBOTT et al.

                  Plaintiffs,         Civil No.  20-2198 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                  Defendants.

---

ROBBIE AMBURGEY et al.

                Plaintiffs,            Civil No.  20-2219 (JRT/KMM)

v.

3M COMPANY and AEARO
TECHNOLOGIES LLC,

                Defendants.

---

**MEMORANDUM OPINION AND ORDER GRANTING OMNIBUS MOTION
FOR REMAND**

---

Daniel E. Gustafson, Amanda M. Williams, and Karla M. Gluek, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402; Mikal C. Watts, **WATTS GUERRA LLP**, 5726 West Hausman Road, Suite 119, San Antonio, Texas 78249; Alicia N. Sieben, Matthew James Barber, and William R. Sieben, **SCHWEBEL GOETZ & SIEBEN PA**, Eighty South Eighth Street, Suite 5120, Minneapolis, MN 55402, for plaintiffs;

Benjamin W. Hulse, Jerry W. Blackwell and S. Jamal Faleel, **BLACKWELL BURKE PA,** 431 South Seventh Street, Suite 2500, Minneapolis, MN 55415 for defendant 3M Company; and Faris Rashid, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for defendant Aearo Technologies LLC.

Plaintiffs wore Combat Arms Earplugs, Version 2 (the "CAEv2"), designed and manufactured by Defendants 3M Company and Aearo Technologies (collectively, "3M"), to protect themselves from loud and damaging sounds.  Each Plaintiff asserts that he or she did not receive instructions on how to properly wear the CAEv2 and, as a result, that he or she now suffers hearing loss and/or developed tinnitus.  Thus, Plaintiffs filed actions in Minnesota state court, each alleging a single product liability claim for failure to warn.

3M removed Plaintiffs' actions to federal court, asserting three grounds for federal jurisdiction: the government contractor defense, the combatant activities exception, and the federal enclave doctrine.  In its opposing brief, 3M then argued that Article IV of the United States Constitution is also a ground for removal jurisdiction.  Finally, in its supplemental brief, 3M added the ground of federal admiralty jurisdiction.  Plaintiffs move the Court to remand for lack of subject-matter jurisdiction.

The Court has already held that the government contractor defense and the combatant activities exception do not confer federal jurisdiction over the type of claims Plaintiffs allege here, and 3M is accordingly precluded from asserting jurisdiction based upon these grounds.  Further, 3M fails to establish that Plaintiffs' injuries arose on federal enclaves, that the Property Clause has any bearing with respect to claims arising on overseas military installations, or that there is a substantial relationship between 3M's alleged tortious activity and traditional maritime activity.  The Court will therefore grant Plaintiffs' Motion to Remand.

## BACKGROUND

### I.  NON-CONTRACTOR CIVILIANS

Over 500 non-contractor civilians are parties to the multiple actions consolidated here.  Each wore the CAEv2 when exposed to damaging, loud impulse, high-pitched sounds.  (*See, e.g.*, ECF 20-1812, Abascal Compl. ¶¶ 102–03, Aug. 19, 2020, Docket No. 1-1.)  Each also alleges that he or she never received instructions to fold back the third

flange of the CAEv2 or a warning that the earplugs would be ineffective if he or she did not do so and, as a result, he or she now suffers from hearing loss and/or tinnitus. (*See, e.g.*, *id.* ¶¶ 104–05.)

## II. CIVILIAN CONTRACTORS

Mustafa Sultan was a contractor for the United States Army from approximately April 2003 to July 2009. (ECF 20-1747, Sultan Compl. ¶ 8, Aug. 11, 2020, Docket No. 1-1.) He was a translator for the Army in Baghdad, Iraq, and he wore the CAEv2 while riding in convoys and while out on missions, during which he was exposed to loud noises from explosions, car bombs, and heavy machinery. (ECF 20-1747, 1st Decl. of Mikal C. Watts ("1st Watts Decl.") ¶ 9, Ex. F ¶ 3, Sept. 9, 2020, Docket No. 13-6.) He does not recall wearing the earplugs in the United States. (*Id.* ¶ 4.) Sultan alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss. (Sultan Compl. ¶¶ 11–12.)

Jay Wasylyna was a civilian contractor for the United States Department of Defense. (1st Watts Decl. ¶ 8, Ex. E ¶ 2, Sept. 9, 2020, Docket No. 13-5.) His first assignment ran from April 2008 through September 2009, during which he first attended a two-week training session at Fort Benning, Georgia, then worked in Iraq for the remainder. (*Id.* ¶ 3.) While in Iraq, he used the CAEv2 while traveling and working, during which he was exposed to loud noises. (*Id.*) His second assignment ran from August 2010

through June 2012, during which he worked in Afghanistan and wore the CAEv2, as he was exposed to loud noises, including continuous rocket fire. (*Id.* ¶ 4.) He does not recall wearing the earplugs in the United States. (*Id.* ¶ 5.) Wasylyna alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from tinnitus. (ECF 20-1753, Wasylyna Compl. ¶¶ 11–12, Aug. 12, 2020, Docket No. 1-1.)

Robert Wallace worked as a firefighter medic for a private company that contracted for the United States Military from 2004 to late 2006. (1st Watts Decl. ¶ 11, Ex. H ¶ 2, Sept. 9, 2020, Docket No. 13-8.) During this time, he worked in various places in Iraq, and he used the CAEv2 because he was exposed to loud noises, such as helicopters, mortars, rockets, and bombs. (*Id.*) He does not recall wearing the earplugs in the United States. (*Id.* ¶ 3.) Wallace alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss. (ECF 20-1757, Wallace Compl. ¶¶ 11–12, Aug. 12, 2020, Docket No. 1-1.)

Forest Taylor worked as a civilian contractor for the United States Army and Navy. (1st Watts Decl. ¶ 6, Ex. C ¶ 2, Sept. 9, 2020, Docket No. 13-3.) From 2007 to 2008, he was stationed in Iraq, where he used the CAEv2 while on heavy convoy patrol and while offering firearms instruction, during which he was exposed to the loud noise of firearms discharging and other loud noises while riding in Humvees. (*Id.* ¶ 3.) From 2012 to 2015,

he was assigned to the Navy Expeditionary Combat School within the Naval Battalion Center (the "Battalion Center") in Gulfport, Mississippi, where he also wore the earplugs and was exposed to the loud noise of firearms discharging. (*Id.* ¶ 4.) Taylor alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from tinnitus and hearing loss. (ECF 20-1758, Taylor Compl. ¶¶ 11–12, Aug. 12, 2020, Docket No. 1-1.)

Douglas Braca worked as a contractor for the Department of Defense from 2008 through 2018. (1st Watts Decl. ¶ 7, Ex. D ¶ 2, Sept. 9, 2020, Docket No. 13-4.) He was a counter-IED expert and law enforcement advisor in Iraq and Afghanistan, during which he wore the CAEv2 and was exposed to the loud noise of rocket attacks, helicopters, noisy aircraft and military vehicles, and land mines. (*Id.* ¶¶ 2–3.) He does not recall wearing the earplugs in the United States. (*Id.* ¶ 4.) Braca alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from tinnitus. (, ECF 20-1763, Braca Compl. ¶¶ 11–12Aug. 13, 2020, Docket No. 1-1.)

Gary Martin was a contractor for the United States Army Corps of Engineers from 2013 to 2017, working on barges on the Hudson River. (ECF 20-1765, 1st Declaration of Benjamin W. Hulse ¶ 4, Ex. A at 6, Dec. 1, 2020, Docket No. 27-1.) He wore the CAEv2 because he was exposed to damaging, loud impulse, high-pitched sounds. (ECF 20-1765,

Martin Compl. ¶¶ 9–10, Aug. 13, 2020, Docket No. 1-1.)  Martin alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus.  (*Id.* ¶¶ 11–12.)

Russell Nisbet was a contractor for the United States Army from 2000 through 2007.  (ECF 20-1769, Nisbet Compl. ¶ 8, Aug. 13, 2020, Docket No. 1-1.)  He was a crane operator in Iraq and Iran, often working close to controlled detonations of IEDs.  (ECF 20-1769, 2nd Decl. of Mikal C. Watts ¶ 12, Ex. I ¶ 2, Sept. 15, 2020, Docket No. 20-9.)  During this time, he wore the CAEv2, as he was exposed to loud noises from the IED explosions, rocket fire, mortar round attacks, and noise from cranes and military vehicles.  (*Id.*)  He does not recall wearing the earplugs in the United States.  (*Id.* ¶ 3.)  Nisbet alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from tinnitus.  (Nisbet Compl. ¶¶ 11–12.)

Vaughn Scher was a contractor for the United States Army from 2007 to 2008 and from December 2009 through December 2011.  (1st Watts Decl. ¶ 10, Ex. G ¶ 2, Sept. 9, 2020, Docket No. 13-7.)  He worked in Iraq, hauling and transporting equipment, and he wore the CAEv2 while in heavy trucks, and on convoys and other missions.  (*Id.* ¶¶ 2–3.)  He does not recall wearing the earplugs in the United States.  (*Id.* ¶ 4.)  Scher alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that

the earplugs would be ineffective if he did not do so and, as a result, he now suffers from tinnitus.  (ECF 20-1771, Scher Compl. ¶¶ 11–12, Aug. 13, 2020, Docket No. 1-1.)

Corey Shott was a personal security detachment contractor for the United States Army from January 2004 until November 2005.  (ECF 20-1772, Schott Compl. ¶ 8, Aug. 13, 2020, Docket No. 1-1.)  During this time, he wore the CAEv2 while in combat training or on the shooting range, as he was exposed to damaging, loud impulse, high-pitched sounds.  (*Id.* ¶¶ 9–10.)  Schott alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus.  (*Id.* ¶¶ 11–12.)

John Harlan worked as a contractor for KBR, Inc. from 2009 until 2010, operating trucks between various military bases, with the majority of this time spent on an air base in Iraq.  (ECF 20-1933, Harlan Compl. ¶ 13, Sept. 11, 2020, Docket No. 1-1.)  While there, he wore the CAEv2, as he was exposed to damaging, loud impulse, high-pitched sounds. (*Id.* ¶ 14.)  Harlan alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus.  (*Id.* ¶¶ 15–16.)

Oral Janice worked as an x-ray technician contractor for the Department of Defense from 2005 until 2010, and he regularly boarded transport helicopters that were extremely loud.  (*Id.* ¶ 21.)  During this time, he wore the CAEv2, as he was exposed to damaging, loud impulse, high-pitched sounds.  (*Id.* ¶ 22.)  He wore the earplugs in

Afghanistan, Iraq, and Kuwait, but never on a stateside military base.  (ECF 20-1933, Decl. of Daniel E. Gustafson ("Gustafson Decl.") ¶ 3, Ex. A ¶¶ 3–4, Oct. 13, 2020, Docket No. 12-1.)  Janice alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss.  (Harlan Compl. ¶¶ 23–24.)

Ernesto Lara worked as a contractor for KBR, Inc. from 2009 until 2011, and he often worked on or near loud compressors and generators, and around gunfire, artillery, and helicopters.  (*Id.* ¶ 25.)  During this time, he wore the CAEv2, as he was exposed to damaging, loud impulse, high-pitched sounds.  (*Id.* ¶ 26.)  He wore the earplugs in Afghanistan, but never on a stateside military base.  (Gustafson Decl. ¶ 4, Ex. B ¶¶ 3–4, Oct. 13, 2020, Docket No. 12-1.)  Lara alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss.  (Harlan Compl. ¶¶ 27–28.)

James Wilkinson worked as a contractor for the Department of Defense from 2004 until 2007, and he was often exposed to explosives and weaponry.  (*Id.* ¶ 33.)  During this time, he wore the CAEv2, as he was exposed to damaging, loud impulse, high-pitched sounds.  (*Id.* ¶ 34.)  He wore the earplugs in Iraq, but never on a stateside military base.  (Gustafson Decl. ¶ 5, Ex. C ¶¶ 3–4, ECF 20-1933, Oct. 13, 2020, Docket No. 12-1.)  Wilkinson alleges that he never received instructions to fold back the third flange of the

CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus. (Harlan Compl. ¶¶ 35–36.)

John Jalili and Larry Porter also worked as contractors. (*Id.* ¶¶ 17, 29.) Each wore the CAEv2, as both were exposed to damaging, loud impulse, high-pitched sounds. (*Id.* ¶¶ 18, 30.) Each alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus. (*Id.* ¶¶ 19–20, 31–32.)

Finally, Eric Bertrand subcontracted with the National Aeronautics and Space Administration ("NASA") at the Plum Brook Reactor. (ECF 20-2039, Aguirre Compl. ¶ 166, Sept. 23, 2020, Docket No. 1-1.) While at Plum Brook, Bertrand worked around heavy machinery and industrial equipment, during which he wore the CAEv2, as he was exposed to damaging, loud impulse, high-pitched sounds. (*Id.* ¶¶ 166–67.) Bertrand alleges that he never received instructions to fold back the third flange of the CAEv2 or a warning that the earplugs would be ineffective if he did not do so and, as a result, he now suffers from hearing loss and tinnitus. (*Id.* ¶¶ 168–69.)

## III. PROCEDURAL BACKGROUND

The non-contractor-civilian Plaintiffs filed their actions in Minnesota state court, alleging that 3M failed to instruct or warn them regarding how to properly fit and safely wear the CAEv2. (*See, e.g.*, Abascal Compl. ¶¶ 512–26.) 3M subsequently gave notice of removal, arguing with respect to the non-contractor-civilian actions that the Court has

subject-matter jurisdiction because 3M asserted the government contractor defense. (*See, e.g.*, ECF 20-1812, Notice of Removal at 3, Aug. 19, 2020, Docket No. 1.)  These Plaintiffs move the Court to remand their actions to state court for lack of subject-matter jurisdiction.  (*See, e.g.*, ECF 20-1812, Mot. to Remand, Sept. 17, 2020, Docket No. 10.)

The civilian-contractor Plaintiffs also filed their actions in Minnesota state court, also alleging that 3M failed to instruct or warn them regarding how to properly fit and safely wear the CAEv2.  (*See, e.g.*, Taylor Compl. ¶¶ 41–55.)  3M subsequently gave notice of removal, arguing with respect to the civilian-contractor actions that the Court has subject-matter jurisdiction based upon 3M's assertion of the government contractor defense and the combatant activities exception, and because alleged injuries occurred in part on federal enclaves.  (*See, e.g.,* ECF 20-1758, Notice of Removal at 3, Aug. 12, 2020, Docket No. 1.)  3M later asserted two additional grounds for removal jurisdiction, Article IV of the United States Constitution and federal admiralty jurisdiction.  (*See, e.g.*, ECF 20-1758, Defs.' Mem. Opp. at 7–11, Sept. 30, 2020, Docket No. 20; ECF 20-1758, Defs.' Suppl. Mem. Opp. at 3–5, Dec. 1, 2020, Docket No. 26.)  These Plaintiffs also move the Court to remand their actions to state court for lack of subject-matter jurisdiction.  (*See, e.g.*, ECF 20-1758, Mot. to Remand, Sept. 9, 2020, Docket No. 10.)

**DISCUSSION**

**I.  STANDARD OF REVIEW**

A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court. *See* 28 U.S.C. § 1441(a); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000).  "A defendant is not permitted to inject a federal question into an otherwise state-law claim and thereby transform the action into one arising under federal law." *Gore*, 210 F.3d at 948 (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).  Instead, as the party seeking removal and opposing remand, a defendant bears the burden of establishing federal subject-matter jurisdiction. *In re Bus. Men's Assurance Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993).  All doubts about federal jurisdiction must be resolved in favor of remand. *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 968 (8th Cir. 2007).

**II.  ANALYSIS**

**A.  FEDERAL DEFENSES**

As a rule, where a complaint pleads only state law claims, a federal court does not typically have jurisdiction based on a federal defense. *See Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 504 (8th Cir. 2001).  Pursuant to 28 U.S.C. § 1142, however, an exception to this rule may apply, which could be the case with respect to the government contractor defense, *see Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012), or the

combatant activities exception, *see Saleh v. Titan Corp.*, 580 F.3d 1, 6 (D.C. Cir. 2009), both

of which 3M asserts here.

### 1.  Government Contractor Defense

In three earlier decisions, the Court held that, when plaintiffs allege only failure-

to-warn claims, 3M "failed to show . . . it plausibly has a colorable claim under the federal

contractor defense." *Graves v. 3M Co.*, 447 F. Supp. 3d 908, 916 (D. Minn. 2020); *see also*

*Copeland v. 3M Co.*, No. 20-1490, 2020 WL 5748114, at *3 (D. Minn. Sept. 25, 2020); *Trail*

*v. 3M Co.*, No. 20-1153, 2020 WL 4193868, at *4 (D. Minn. July 21, 2020) ("[A]s in *Graves*,

design-defect claims are not made here . . . Accordingly, there are no inconsistent

judgments in favor of 3M, and no bar to issue preclusion.").  Even so, 3M asks the Court

to revisit its previous holdings, as the MDL court that is handling other CAEv2 cases has

twice denied remand.[1]  *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 19-2885,

2020 WL 5835311, at *4 (N.D. Fla. Oct. 1, 2020); *In re 3M Combat Arms Earplug Prod. Liab.*

*Litig.*, No. 19-2885, 2020 WL 365617, at *6 (N.D. Fla. Jan. 22, 2020).

---

[1] In the alternative, 3M asks the Court to stay consideration of the remand Motions to allow the MDL court to consider the availability of the government contractor defense with respect to the current Plaintiffs.  The Court declines this request, as the two courts have not issued inconsistent judgments, as explained in the paragraph immediately following, nor has the MDL court considered the remaining jurisdictional grounds 3M asserts here, whereas the Court already has or will have by this Order's end.

However, as the Court has repeatedly noted,[2] the MDL court has only considered complaints alleging either design-defect claims, alone, or design-defect claims paired with failure-to-warn claims. *In re 3M*, 2020 WL 5835311, at *2; *In re 3M*, 2020 WL 365617, at *2. In contrast, Plaintiffs allege only failure-to-warn claims, as was the case in *Graves*, *Trail*, and *Copeland*. *See, e.g.*, *Graves*, 447 F. Supp. 3d at 912. As such, the MDL court's rulings are not inconsistent with the Court's earlier holdings, nor are they applicable to the claims that Plaintiffs assert here. The Court therefore finds that the government contractor defense remains unavailable, once again, as the design of the CAEv2 is not in issue.

### 2. Combatant Activities Exception

When "a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Saleh*, 580 F.3d at 9; *see also Bentzlin v. Hughes Aircraft Co.,* 833 F. Supp. 1486, 1489 (C.D. Cal. 1993) (finding the exception to be available when contractors furnish the armed forces with sophisticated military equipment that only has use in combat). However, tort claims arising out of contractor

---

[2] Because 3M continues to assert the government contractor defense, even though it has been repeatedly precluded, Plaintiffs ask the Court to award them fees and costs under 28 U.S.C. § 1447(c). However, "[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The Court finds that 3M has a reasonable basis for continuing to assert this defense, for it needs to do so to preserve the issue for appeal, as the Eighth Circuit has not yet rejected or affirmed it. Thus, the Court will deny Plaintiffs' request.

services that are judged to be separate and apart from United States combat activities would not be preempted.  *See Saleh*, 580 F.3d at 9.

In *Copeland*, the Court found that 3M failed to demonstrate that it was integrated into combatant activities over which the military retained command authority, that the CAEv2 was sophisticated military equipment only to be used in combat, or that 3M's alleged tortious conduct was the result of battlefield decisions or orders.  *Copeland*, 2020 WL 5748114, at *3.  As such, the Court held that 3M failed to show a uniquely federal interest in significant conflict with state law, thereby making the combatant activities exception an uncolorable defense.  *Id.*

Because 3M was a party in *Copeland*, the issue is the same as that litigated in *Copeland*, and because there was a final judgment in *Copeland*, to which the combatant activities defense was essential, the Court finds that 3M is precluded from asserting this defense again.  *See Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098, 1102–03 (8th Cir. 2013); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330–331 (1979) (concluding that district courts have broad discretion to employ offensive issue preclusion when it would not lead to unfair or inconsistent results).

In sum, the Court finds that both federal defenses are precluded by its previous holdings.  Accordingly, the Court concludes that neither defense offers a ground for removal jurisdiction.

**B. FEDERAL ENCLAVE DOCTRINE**

3M next asserts that the federal enclave doctrine supports removal.  A federal enclave is created when three requirements are met: (1) the United States acquires land in a state for one of the purposes mentioned in the Enclave Clause of Article I of the United States Constitution, (2) the state legislature consents to the exclusive jurisdiction of the federal government over the land, and (3) the federal government accepts this grant of jurisdiction by filing a notice of acceptance with the state governor or in a manner prescribed by the laws of the state.  *See Paul v. United States*, 371 U.S. 245, 264 (1963); *see also* U.S. Const. Art. I, § 8, cl. 17; 40 U.S.C. § 3112(b).  Military bases, federal facilities, and even some national forests and parks can be enclaves, if the above requirements are met.  *See Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012).

Most important, personal injury actions arising from incidents occurring on properly established federal enclaves may be removed to federal district court, *see Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998), as the grant of exclusive jurisdiction to the United States bars state regulation over enclaves without specific congressional action, *see W. River Elec. Ass'n, Inc. v. Black Hills Power & Light Co.*, 918 F.2d 713, 716 (8th Cir. 1990).  That is, federal district courts would have federal question jurisdiction over personal injury claims arising on federal enclaves.

Yet, as the Court noted in *Copeland*, courts have consistently found that federal jurisdiction does not extend to military installations on foreign soil,[3] as such sites do not meet the Enclave Clause requirements. *Copeland*, 2020 WL 5748114, at *4 (concluding that no alleged injuries arose on a federal enclave, as they occurred in Iraq, so the doctrine was inapplicable). Here, however, 3M argues that the injuries of two Plaintiffs—Bertrand and Taylor—arose, at least in part, on stateside federal enclaves. As such, 3M asserts, the Court has jurisdiction over Bertrand's and Taylor's claims.[4]

### 1. Bertrand

Bertrand alleges that he was injured while working at NASA's Plum Brook nuclear reactor. The United States purchased roughly 113 acres of land in Ohio for the Plum Brook Ordnance site in 1941.[5] Then, in 1958, the Atomic Energy Commission described the property as "the 6,500 acre Plum Brook Ordnance Work site" when granting NASA's

---

[3] *See, e.g.*, *Harris v. Kellogg, Brown & Root Servs., Inc.*, 796 F. Supp. 2d 642, 656 n.7 (W.D. Pa. 2011) (Enclave Clause does not apply to military installation in Iraq); *Gavrilovic v. Worldwide Language Res., Inc.*, 441 F. Supp. 2d 163, 177 (D. Me. 2006) (same); *Nguyen v. Allied Signal, Inc.*, No. 98-3616, 1998 WL 690854, at *1 (N.D. Cal. Sept. 29, 1998) (noting that federal question jurisdiction arises only when land is sold to the federal government by a state and the state explicitly consents to federal government control and authority).

[4] 3M also suggests that Martin, Shott, Harlan, Janice, Lara, Wilkinson must have suffered some part of their injuries on stateside enclaves, but 3M fails to identify any specific sites or show that the federal enclave doctrine is implicated in any way. 3M bears the burden to establish federal jurisdiction at the removal stage, and all doubts must be resolved in favor of remand. *See In re Bus. Men's Assurance Co.*, 992 F.2d at 183; *Dahl*, 478 F.3d at 968. As such, the Court finds that these Plaintiffs' claims are not subject to the federal enclave doctrine.

[5] (ECF 20-1899, 2nd Decl. of Benjamin W. Hulse ("Hulse Decl.") ¶ 18, Ex. L at 139, Nov. 3, 2020, Docket No. 19-1.)

predecessor agency a permit to build a reactor there.  *In the Matter of Nat'l Advisory Comm. for Aeronautics*, 1 A.E.C. 42, 45 (1958).  The Commission, when subsequently granting NASA a permit to operate the reactor, remarked that the property was owned by the United States Government and under the control of NASA.  *See In the Matter of Nat'l Aeronautics & Space Admin.*, 1 A.E.C. 633, 637, 649 (1961).

Additionally, the reactor falls within the "other needful buildings" provision of the Enclave Clause.  *James v. Dravo Contracting Co.*, 302 U.S. 134, 143 (1937) ("We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government."); *see also J & L Mgmt. Corp. v. New Era Builders, Inc.*, No. 09-0531, 2009 WL 1707886, at *3–4 (N.D. Ohio June 17, 2009) (finding another NASA research center in Ohio to be a federal enclave).  Thus, the Court finds that the first enclave requirement is met with respect to Plum Brook.

With respect to the second requirement, the Ohio legislature consented to the exclusive jurisdiction of the federal government in lands acquired by the United States, after May 6, 1902, which extends to several enumerated types of buildings and "other public buildings whatever, or for any other purposes of the government."  O.R.C. § 159.03; *see also* O.R.C. § 159.04 (ceding exclusive jurisdiction to the United States).  The Plum Brook land was acquired by the United States, for a federal purpose and after May 6, 1902, so the Court finds that the second requirement is met as well.

With respect to the third and final requirement, the Secretary of War sent two letters to the governor of Ohio—first in December 1944, then in December 1945—both of which noted that Ohio had consented to federal jurisdiction over lands acquired by the United States for military and other purposes, then accepted exclusive jurisdiction over all lands acquired by the United States "for military purposes . . . title to which has heretofore vested[.]"[6]  The Secretary therefore accepted exclusive federal jurisdiction of land acquired in Ohio prior to December 1945 for military purposes, as mandated by statute.  *See* 40 U.S.C. § 3112(b).

Yet, while the Plum Brook site certainly encompassed at least 113 acres by the end of 1945, and the land was described as a military ordnance site then—thus making this portion of the property a federal enclave—3M has not demonstrated if the United States acquired Plum Brook's additional 6,387 acres prior to December 1945.  3M also does not address whether NASA separately accepted exclusive jurisdiction over the property,[7] or if NASA's mission on the additional acreage was a military one.  *See, e.g.*, *J & L Mgmt.*, 2009 WL 1707886, at *4.  Moreover, § 3112 establishes a conclusive presumption against exclusive federal jurisdiction.  *See* 40 U.S.C. § 3112(c).

---

[6] (Hulse Decl. ¶¶ 19–20, Ex. M at 141 & Ex. N at 144, Nov. 3, 2020, Docket No. 19-1.)

[7] 3M did present documents demonstrating that NASA presumably receded jurisdiction over 6,500 acres to Ohio in 2011.  (Hulse Decl. ¶ 21, Ex. 0 at 149–53, Nov. 3, 2020, Docket No. 19-1.)  However, such documents do not demonstrate that there was an initial filing of a notice of acceptance of jurisdiction over these lands with the Ohio governor, as required by federal statute.  *See* 40 U.S.C. § 3112(b).

As such, the Court finds that 3M has not met its burden to establish that any part of the Plum Brook property beyond the original 113 acres is a federal enclave. Further, Bertrand's injuries may have occurred off the original 113 acres, which weighs in favor of remand. *See, e.g.*, *Hatten v. Grobet USA*, No. 20-0099, 2020 WL 4282276, at *5 (D. Ariz. July 27, 2020) (remanding when it was unclear whether the acts in issue occurred on property ceded after rather than before jurisdiction was accepted). Accordingly, the Court finds that it lacks federal question jurisdiction over Bertrand's claims.

### 2. Taylor

Taylor states that he used the CAEv2 in Iraq from 2007 to 2008 and at the Battalion Center from 2012 to 2015. The Battalion Center is a federal enclave. *See United States v. State Tax Comm'n of Miss.*, 412 U.S. 363, 371–73 (1973). Thus, the Court finds Taylor's injuries occurred both on and off a federal enclave.

Many courts, when considering on-and-off-enclave claims, have held that federal question jurisdiction depends on whether "the locus in which the claim arose is the federal enclave itself." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1125 (N.D. Cal. 2012) (quotation omitted). As such, only claims arising on the enclave itself would be barred.[8] *See id.* at 1126; *see also Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538, 565 (D. Md. 2019) (noting that courts have only found federal

---

[8] Another court has noted that when some of a plaintiff's injuries occur off-base, the federal interest in exercising federal question jurisdiction over the resultant claims decreases, whereas the state's interest increases. *Akin v. Big Three Indus., Inc.*, 851 F. Supp. 819, 825 n.4 (E.D. Tex. 1994). The Court agrees.

question jurisdiction when all or most pertinent events occurred on a federal enclave), *as amended* (June 20, 2019), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *cert. granted*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020).

One court has stated that a substantial nexus between an enclave and a personal injury claim is not always needed: "[t]he fact that the injury occurred there is sufficient." *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1328 (N.D. Ala. 2010). However, in that case, the plaintiff worked interchangeably on enclaves, while at Navy bases, and off enclaves, while at sea, over decades. *See id.* at 1328–29. Given such a situation, determining where and when that plaintiff's claims first arose was next to impossible. Conversely, the Court does not consider the question of where and when Taylor's injuries first arose to be difficult, and the Court thus finds the "locus" approach to be more persuasive than *Corley*'s.

Here, Taylor alleges that he first suffered injury in Iraq in 2007. He then sustained injuries there over a year, during which his hearing likely degraded and tinnitus began, both of which constitute pertinent events. As such, the Court finds that Taylor's claims did not arise on a federal enclave and are therefore not subject to the federal enclave doctrine. Accordingly, the Court concludes that it lacks federal question jurisdiction over Taylor's claims.

## C. ARTICLE IV

In its opposing brief,[9] 3M asserts another ground to establish removal jurisdiction: the Property Clause of Article IV of the United States Constitution, which is said by 3M to confer federal question jurisdiction over claims arising on overseas military installations in Iraq.[10]

The Property Clause states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. Art. IV, § 3, cl. 2. These words have been interpreted to give Congress complete power to regulate public lands within state borders, *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), and to govern territories, including the people within such territories, *De Lima v. Bidwell*, 182 U.S. 1, 196 (1901). The Property Clause has also been read to grant Congress the power, in certain situations, to regulate the

---

[9] Plaintiffs contest 3M's late addition of this ground. Generally, new grounds for removal jurisdiction cannot be added after thirty days have elapsed since the defendant was served with or received the complaint. *See, e.g.*, *Lindsey v. Dillard's, Inc.*, 306 F.3d 596, 600 (8th Cir. 2002). More than thirty days had passed when 3M added this ground. The Court notes, however, that amendments to the notice of removal are often afforded the same liberal pleading standard as that allowed under Federal Rule of Civil Procedure 15. *See* 14C Charles Allen Wright et al., Federal Practice and Procedure § 3733 (4th ed.). Further, 3M could not have known to assert such a ground until Plaintiffs fleshed out their initially bareboned allegations by way of later declarations. As such, the Court finds that 3M is not procedurally barred from asserting this ground for jurisdiction; thus, the Court will reach the merits of 3M's Property Clause claim.

[10] 3M also suggests that the Property Clause likewise confers federal question jurisdiction over claims arising stateside or in Afghanistan, but 3M does not spend more than a couple of sentences developing this argument. As such, the Court will only not reach the merits with respect to stateside military installations or those in Afghanistan.

-25-

actions of United States citizens in areas even outside the territorial jurisdiction or sovereignty of the United States. *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 379–81 (1948) (holding that Congress intended the Fair Labor Standards Act to apply to a leased military base in Bermuda given Congress's inclusion of "Territory or possession" when writing the Act).

However, in all cases, to activate the broad power extended by the Property Clause—which would confer federal question jurisdiction over claims arising in the relevant land, territory, possession, or property—Congress must affirmatively act to exercise this power. *See, e.g.*, *Texas Oil & Gas Corp. v. Phillips Petroleum Co.,* 277 F. Supp. 366, 368–69 (W.D. Okla. 1967), *aff'd per curiam,* 406 F.2d 1303 (10th Cir. 1969), *cert. denied,* 396 U.S. 829 (1969).

Yet, here, 3M has not demonstrated that Congress acted as such with respect to military installations in Iraq. Instead, 3M points to documents from the Coalition Provisional Authority ("CPA") to support a finding of federal question jurisdiction. However, the CPA did not derive its authority from federal law or the United States Constitution; rather, it grounded its authority in the laws of war and international law.[11] Further, the CPA did not exercise sovereign authority in Iraq, for it shared governing

---

[11] *See, e.g.*, Coalition Provisional Authority, Order Number 17 (Revised) at 1 (June 27, 2004) https://govinfo.library.unt.edu/cpa-iraq/regulations/20040627_CPAORD_17_Status_of_Coalition__Rev__with_Annex_A.pdf.

responsibility with another occupying power, the United Kingdom.[12]  Finally, and most important, Congress had no part in creating the CPA: the CPA evolved out of the Office of Reconstruction and Humanitarian Assistance, which was created by presidential directive,[13] then run by the Secretary of Defense through United States Central Command.[14]

In sum, the Court finds that 3M has failed to establish that the Property Clause has any bearing on personal injury claims arising on military installations in Iraq.  Accordingly, the Court concludes that it lacks federal question jurisdiction over Plaintiffs' claims based upon this asserted ground.

### D. FEDERAL ADMIRALTY JURISDICTION

After limited jurisdictional discovery concluded, 3M asserted a final ground for removal jurisdiction: federal admiralty jurisdiction with respect to Martin's claims.  "[A] party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Here, Martin worked on

---

[12] *See* S.C. Res. 1483 at 2 (May 22, 2003), http://unscr.com/files/2003/01483.pdf.

[13] Exec. Off. of the President, National Security Presidential Directive 24 (Jan. 20, 2003), https://fas.org/irp/offdocs/nspd/nspd-24.pdf.

[14] Even so, the head of the CPA, L. Paul Bremer, still stated that "it is not entirely clear that the CPA was a U.S. government entity."  James Dobbins et al., Occupying Iraq: A History of the Coalition Provisional Authority 14 (2009).

barges on the Hudson River and suffered his injuries while doing so, thus satisfying the location test, as his injuries occurred on navigable waters.

However, with respect to the connection test, a party must demonstrate that the tortfeasor's activity on navigable waters shows a substantial relationship to traditional maritime activity. *See id.* at 539 (noting that the navigation of boats and the storage of boats at a marina on navigable waters both demonstrate the requisite relationship but flying an airplane over water or swimming does not). The Court finds that 3M's alleged tortious activity—supplying earplugs without adequate warnings or instructions—does not show a substantial relationship to traditional maritime activity. That an alleged wrong occurred on navigable waters is not sufficient to convert a product liability claim into a maritime tort. *See Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268 (1972). The Court therefore concludes that federal admiralty jurisdiction is lacking with respect to Martin's claims.

## CONCLUSION

Because both federal defenses asserted by 3M are precluded by the Court's earlier decisions, neither the government contractor defense nor the combatant activities exception provides a ground for removal jurisdiction. Additionally, 3M has not demonstrated that Plaintiffs' claims arose on federal enclaves, or that the Property Clause has any import with respect to claims arising on military installations overseas. Finally, 3M has not shown that its alleged tortious conduct has a substantial relationship with

traditional maritime activity.  As such, the Court finds that it lacks subject-matter jurisdiction over Plaintiffs' claims.  Accordingly, the Court will grant Plaintiffs' Motions to Remand.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motions to Remand:

1.   Sultan, CV20-1747, Docket No. 10;

2.   Wasylyna, CV20-1753, Docket No. 10;

3.   Wallace, CV20-1757, Docket No. 10;

4.   Taylor, CV20-1758, Docket No. 10;

5.   Braca, CV20-1763, Docket No. 11;

6.   Martin, CV20-1765, Docket No. 11;

7.   Nisbet, CV20-1769, Docket No. 17;

8.   Scher, CV20-1771, Docket No. 10;

9.   Shott, CV20-1772, Docket No. 10;

10.   Abascal, CV20-1812, Docket No. 10;

11.   Acosta, CV20-1899, Docket No. 10;

12.   Harlan, CV20-1933, Docket No. 9;

13.   Aguirre, CV20-2039, Docket No. 9;

14.   Arndt, CV20-2089, Docket No. 14;

      15.    Abbott, CV20-2198, Docket No. 8; and

      16.    Amburgey, CV20-2219, Docket No. 7

are **GRANTED.**

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  December 2, 2020
at Minneapolis, Minnesota.

                         JOHN R. TUNHEIM
                             Chief Judge
                United States District Court